UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
:
MARCO ANTONIO PEREZ PEREZ, et al.,              :

      Plaintiff,              :       OPINION AND ORDER

    -v.-                                              :       20 Civ. 8010 (LTS) (GWG)

ESCOBAR CONSTRUCTION, INC., et al.,              :

      Defendants.              :
-------------------------------------------------------------x

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

      Plaintiffs Marco Antonio Perez Perez and Jose Eduardo Sanchez Arias filed this lawsuit against Escobar Construction, Inc., Nations Construction, Inc., JRS Services, LLC, and several individual defendants, their purported employers. Plaintiffs have moved to have this case conditionally approved as a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201 et. seq. ("FLSA"), with notice being sent to "all current and former non-exempt and non-managerial employees" of defendants.[1] For the following reasons, plaintiffs' motion is granted in part and denied in part.

I. BACKGROUND

      The following facts are taken from the plaintiffs' amended complaint (see Docket # 28) ("Am. Compl.") and the affidavits submitted by plaintiffs in connection with this motion. See Perez Aff.; Arias Aff.

---

[1] See Notice of Motion, filed January 15, 2021 (Docket # 67); Declaration of John Troy in Support, filed January 15, 2021 (Docket # 68) ("Troy Decl."); Affidavit of Marco Antonio Perez Per[e]z in Support, filed January 15, 2021 (Docket # 69) ("Perez Aff."); Affidavit of Jose Eduardo Sanchez Arias in Support, filed January 15, 2021 (Docket # 70) ("Arias Aff."); Memorandum of Law in Support, filed January 15, 2021 (Docket # 71) ("Pl. Mem."); Opposition to Plaintiffs' Motion for Conditional Collective Certification, filed March 12, 2021 (Docket

A. <u>Allegations from the Amended Complaint</u>

Plaintiffs are two construction workers. Am. Compl. ¶¶ 58, 77. Plaintiffs allege that defendants Escobar Construction, Nations Construction, and JRS Services were their joint employers, as demonstrated by the corporations "shar[ing] staff, including Plaintiffs who would perform construction work at the various worksites," "pay[ing] Plaintiffs for the work performed as an indistinguishable entity," "advertis[ing] the Corporate Defendants as an enterprise," and being "co-owned by the same partners, namely the Escobar/Palacios family." <u>Id.</u> ¶ 46.

Plaintiffs allege that Perez was employed by defendants from December 2017 to October 2018 at a worksite in Ithaca, New York. <u>Id.</u> ¶ 58. Perez worked eighty-four-hour weeks the entirety of that period, <u>id.</u> ¶ 63, with no lunch break, <u>id.</u> ¶ 60. He was paid a rate of first $18 an hour and then $25 an hour during that period, <u>id.</u> ¶ 65, rather than the "one-and-one-half his promised wage for all hours worked above forty (40) in each workweek," <u>id.</u> ¶ 74. Plaintiffs also state that Perez is owed many thousands of dollars, due to not "receiv[ing] payment for all the days that he worked," <u>id.</u> ¶ 66, not being reimbursed for purchasing painting supplies and for hotel rooms, <u>id.</u> ¶¶ 68-69, and for wages that were "paid to him but . . . withdrawn by some[ ]other person," <u>id.</u> ¶ 70.

Arias was employed from September 2017 to October 2018 at the Ithaca worksite, <u>id.</u> ¶ 77, and also worked eighty-four-hour weeks with no lunch break, <u>id.</u> ¶¶ 79-80. He was paid first at a rate of $13 an hour, then $17 an hour, then $18 and $24, <u>id.</u> ¶¶ 82-85, but was never paid overtime, <u>id.</u> ¶ 88. Plaintiffs also claim that Arias is owed thousands of dollars in wages in addition to the statutory compensation owed him, <u>id.</u> ¶ 92.

---

# 76) ("Def. Mem."); Reply Memorandum of Law in Support, filed March 26, 2021 (Docket
# 77) ("Pl. Reply").

Plaintiffs seek to bring a collective action "on behalf of all other and former non-exempt employees who have been or were employed by the Defendants for up to the last three (3) years . . . whom [sic] were not compensated at their promised hourly rate for all hours worked and at one and one half times their promised work for all hours worked in excess of forty (40) hours per week."  Id. ¶ 93.

    B.  Facts from Affidavits

        1.  Perez's Affidavit

Perez repeats the allegations concerning his employment in his affidavit.  Compare Perez Aff. ¶¶ 3-22 with Am. Compl. ¶¶ 58-76.  He states that he worked at several different worksites for defendants besides the Ithaca worksite, including ones in Binghamton, New York, Columbus, Ohio, Kansas City, Kansas, and West Lafayette, Indiana.  Perez Aff. ¶ 23.  At those worksites, he talked with coworkers and "some I know also suffered same [sic] practice and policy of Defendants and were also promised hourly rates but not paid in full."  Id. ¶ 24.  He states that his coworkers were also "not paid overtime pay and minimum wage, and are owed wages for having their lunch hour illegally deducted from their hours worked, even though they had to work through the break."  Id. ¶ 25.

Perez identifies several coworkers who were also subject to these policies.  Specifically, he and Victor Fernando Perez Aguilar, a painter, id., ¶ 27, "frequently compared each other's pay during lunchtime hours," id. ¶ 32, in "New York, Ohio, Indiana, and Kansas City," id. ¶ 33, and they were both "not paid overtime" and had their "lunch hour deducted" even though they worked through it, id. ¶ 32.  Perez states that he knew Aguilar's pay also "because I supervised him and a small group of painters as the head painter."  Id. ¶ 34.  Perez repeats these statements for two other painters he worked with, Jose Perez Aguilar and Juan Carlos Perez Aguilar.  See

3

generally id. ¶¶ 35-50.  He identifies six other painters (Vilgar Perez, Bladimir Marroquin, Manuel Arita, David Aguilar, Ulices Hernandez, and Dorian Hernandez) that he claims similarly worked eighty-four-hour weeks, though he includes no facts explaining how he knows this.  Id. ¶¶ 51-66. ¶¶ 73-80.  He states he had a conversation with another painter, Gabino Santiago, in which Santiago told him "in Winter 2017 at the New York work site" that he "did not receive overtime pay, and had one hour illegally deducted from our paycheck each week." Id. ¶ 71.  He similarly states that he had a conversation "in summer of 2017 during our lunch break at the New York work site" with Eleazar Ramirez, a different painter, in which Ramirez "told me he was paid . . . [$17] per hour, with no overtime pay." Id. ¶ 86.

Perez's affidavit identifies two "finishers" and two "laborers" who worked for Escobar Construction, id. ¶¶ 87, 90, 93, 96, at different work sites, id. ¶¶ 89, 92, 95, 98, but includes no information about their hours or pay.  He identifies two supervisors employed by Escobar Construction, Angel Guzman and David Analla, id. ¶¶ 99, 107.  Perez states that he was "close friends" with Guzman, id. ¶ 103, that Guzman worked 60-hour weeks, id. ¶ 102, and that they discussed their pay at Guzman's "home and restaurant in Ithaca, NY, and Indiana," where Guzman told Perez "that he was paid [$1200] per week," id. ¶¶ 104-05.  Perez states that Analla also worked 60-hour weeks, although he does not explain how he knows that, id. ¶ 110.

2. Arias's Affidavit

Arias also repeats the allegations of the amended complaint pertaining to him in his affidavit.  Compare Arias Aff. ¶¶ 3-20 with Am. Compl. ¶¶ 77-92.  Arias states he "received paychecks and paystubs from both Escobar and Nations Constructions," and identifies different worksites that he worked at, which are the same sites that Perez worked at, id. ¶¶ 21-22.

4

Arias identifies the same coworkers as Perez in his affidavit and states that he learned details about the painters' pay because they "would talk with each other at the hotel we resided in at the New York, Ohio, Indiana, and Kansas City work sites." Id. ¶ 34. He also mentions that "the painters would discuss each other's pay during lunchtime hours at Escobar Construction." Id. ¶ 40. He provides more detail about some of the coworkers mentioned in Perez's affidavit. See id. ¶¶ 57 (worked with Bladimir Marroquin and saw his paycheck reflecting no overtime), 64 (spoke with Manuel Arita about his pay and lack of overtime), 72-73 (spoke with David Aguilar about being paid $20 an hour and knew he was not paid overtime because of lunchtime discussions), 87 (spoke with Ulices Hernandez about his pay and no overtime), 95 (spoke with Dorian Hernandez about lack of overtime and illegal deduction of hours). He also states the pay rate for the finishers, that they received "no overtime pay" (although he does not state how many hours they worked), and that he knows this because they "are good friends and had a conversation about our pay." Id. ¶¶ 106-07, 111-12. He similarly states that the laborers were not paid overtime, but gives no details concerning their hours or how he knows this. Id. ¶¶ 117, 121. He identifies the same supervisors and states that Guzman was paid "[$1200] per week with no overtime" and he learned this when "he told me in Ithaca, 2018 during lunch time," id. ¶¶ 126-27, and that Analla was paid "[$2000] per week with no overtime" and that he knows this "because I am a friend of his son," who "told me in Ithaca of the year 2018" about Analla's pay rate, id. ¶¶ 132-34.

## II. LEGAL STANDARD

The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). Section 216(b) of the FLSA provides, in pertinent part:

5

> An action to recover . . . liability . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Id. § 216(b). While the statute does not prescribe any procedures for approval of collective actions, section 216(b) has long been construed to grant authority to a district court to mandate that notice be given to potential plaintiffs informing them of the option to join the suit. See Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 169 (1989) ("[D]istrict courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs."); Braunstein v. E. Photographic Labs., Inc., 600 F.2d 335, 336 (2d Cir. 1978) (per curiam) ("Although one might read the [FLSA], by deliberate omission, as not providing for notice, . . . it makes more sense, in light of the 'opt-in' provision of § 16(b) of the Act . . . to read the statute as permitting, rather than prohibiting, notice in an appropriate case."). Orders authorizing notice are sometimes referred to as orders "certifying" a collective action, even though the FLSA does not contain a certification mechanism. Myers v. Hertz Corp., 624 F.3d 537, 555 n.10 (2d Cir. 2010). When a court refers to "certifying" a collective action, however, it means only that the court has exercised its discretionary power "to facilitate the sending of notice" to similarly situated individuals. Id. The approval of a collective action thus amounts to a "'case management' tool for district courts to employ in 'appropriate cases.'" Id. (quoting Hoffmann-La Roche, 493 U.S. at 169, 174).

The requirements of Rule 23 of the Federal Rules of Civil Procedure do not apply to the approval of a collective action. Young v. Cooper Cameron Corp., 229 F.R.D. 50, 54 (S.D.N.Y. 2005); see also Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 78 (2013) ("Whatever significance 'conditional certification' may have in § 216(b) proceedings, it is not tantamount to class certification under Rule 23."). Accordingly, "no showing of numerosity, typicality,

commonality, and representativeness need be made." Young, 229 F.R.D. at 54. Furthermore, "while a class under Rule 23 includes all unnamed members who fall within the class definition, the 'sole consequence of conditional certification [under § 216] is the sending of court-approved written notice to employees . . . who in turn become parties to a collective action only by filing written consent with the court.'" Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 449 (2016) (quoting Genesis Healthcare Corp., 569 U.S. at 75).

The Second Circuit has endorsed a "two-step process" for approval of an FLSA collective action:

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law. . . . At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs.

Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 540 (2d Cir. 2015). Thus, "[t]he threshold issue in deciding whether to authorize class notice in an FLSA action is whether plaintiffs have demonstrated that potential class members are 'similarly situated.'" Hoffman v. Sbarro, Inc., 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (quoting 29 U.S.C. § 216(b)). Plaintiffs' motion is concerned with only the first step of this process.

"Neither the FLSA nor its implementing regulations define the term 'similarly situated.' However, courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." Id. (citing cases); accord Myers, 624 F.3d at 555; Garcia v. Spectrum of Creations Inc., 102 F. Supp. 3d 541, 547 (S.D.N.Y. 2015). In other words, at this preliminary stage, the focus of the inquiry "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under

7

29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." Young, 229 F.R.D. at 54; accord Garcia, 102 F. Supp. 3d at 547. While only a "modest factual showing" is required, the burden on a plaintiff "is not non-existent and the factual showing, even if modest, must still be based on some substance." Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010).

"At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." Myers, 624 F.3d at 555; accord Juarez v. 449 Rest., Inc., 29 F. Supp. 3d 363, 369 (S.D.N.Y. 2014).

III. DISCUSSION

Plaintiffs seek various forms of relief in their motion, including "granting collective action status," "ordering the Defendants within fourteen . . . days of the entry of this Order" to produce various information about their employees to plaintiffs, approving the notice's language and means of dissemination, allowing for "an opt-in period of 90 days from the day of dissemination of the notice and its translation," and granting "equitable tolling on the statute of limitation on this suit . . . for 90 days until the expiration of the Opt-in Period." Notice of Motion at 1-2. Defendants oppose all of this relief, arguing that plaintiffs' motion should be denied because plaintiffs were independent contractors of defendants, and thus not covered by the FLSA. Def. Mem. at 1. Defendants alternatively seek limitations to the "alleged collective certification" and "modifications to the proposed notice and limitations on how any approved notice is disseminated." Id. at 2.

We address first whether authorization of any notice is appropriate in this case, and then turn to the scope of the collective action and conclude by addressing the request for equitable

tolling. We resolve the parties' disagreements over the language in and dissemination of the notice in a separate order being issued herewith.

A. <u>Whether a Notice Should Be Authorized</u>

Defendants argue that this motion is "premature because Plaintiffs, as independent contractors, are not entitled to the alleged overtime payment and because the alleged Defendants do not constitute an 'enterprise' as defined by the FLSA." Def. Mem. at 7. They argue that authorizing a notice "now would be to place building blocks on a foundation of sand." <u>Id.</u> They then make arguments about how "the facts outlined" in their filing demonstrate that plaintiffs are independent contractors, <u>id.</u> at 8, and as to how Escobar, JRS, and Nations "did not constitute an enterprise," <u>id.</u> at 9. They urge that these showings require denial of plaintiffs' motion. <u>Id.</u> at 8-10.

The problem with these arguments is that, at the conditional approval stage, "the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." <u>Lynch v. United Servs. Auto. Ass'n</u>, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007); <u>accord</u> <u>Guzman v. Three Amigos SJL Inc.</u>, 117 F. Supp. 3d 516, 527 (S.D.N.Y. 2015) (arguments that "plaintiffs are not employees under the FLSA, attack the merits of the case, raise factual disputes, or question the credibility of Plaintiffs' declarations . . . are not issues that can be addressed at this juncture") (punctuation omitted). The focus of the Court's inquiry at this stage "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." <u>Young</u>, 229 F.R.D. at 54. Thus, there is "ample case law holding that consideration of the merits is absolutely inappropriate at the conditional approval stage." <u>Wood v. Mike Bloomberg 2020, Inc.</u>, 484 F. Supp. 3d 151, 158 (S.D.N.Y.

9

2020) (punctuation omitted).  Accordingly, defendants' arguments about plaintiffs' status as independent contractors cannot be resolved at this stage, and thus cannot bar the authorization of a notice to the proposed collective.  See, e.g., Jeong Woo Kim v. 511 E. 5th St., LLC, 985 F. Supp. 2d 439, 447 (S.D.N.Y. 2013) (refusing to consider at the conditional approval stage the argument that plaintiff was an "independent contractor" rather than an "employee").

As for defendants' arguments about the various corporate defendants being separate "enterprises" under the FLSA, the Court notes that the test for conditional approval of a collective action "does not ask a court to definitively resolve who may be the plaintiffs' employer or what policies that employer has instituted."  Contrera v. Langer, 278 F. Supp. 3d 702, 715 (S.D.N.Y. 2017).  Rather, it asks only "whether the plaintiffs have made an adequate factual showing to support an inference that . . . a uniform policy or practice exists, and whether the locations share common ownership or management."  Id. (punctuation omitted).  Thus, a conditional approval ruling "will not determine whether all defendants are in fact employers of plaintiffs."  Id.  Furthermore, "if the plaintiff's allegations are sufficient on their face to support [conditional approval], a defendant may not defeat the plaintiff's motion by presenting conflicting factual assertions."  Jeong Woo Kim, 985 F. Supp. 2d at 446.

Here, plaintiffs have alleged that the corporate defendants in this action shared staff, paid plaintiffs "as an indistinguishable entity," and were "co-owned by the same partners."  Am. Compl. ¶ 46.  Arias's affidavit states that he "received paychecks and paystubs from both Escobar and Nations Constructions."  Arias Aff. ¶ 21.  Plaintiffs further allege that Jhony Escobar, an individual defendant, "maintained employee records through corporate emails" at both Escobar Construction and Nations Construction, Am. Compl. ¶ 19, that his son, Elias Palacios, id. ¶ 29, "maintained employee records at [JRS Services]," id. ¶ 28, and supervised

10

both plaintiffs, id. ¶¶ 30-31, even though Jhony Escobar "actually hired Plaintiffs," id. ¶ 24, and fired plaintiffs, id. ¶¶ 25-26.  Plaintiffs allege that Palacios would "distribute pay checks sent by" both Escobar and Nations.  Id. ¶ 33.  They allege that Escobar and Nations maintained a common manager, Luis Enrique Monzon, who reported Arias's "working hours to the offices of [Escobar]."  Id. ¶¶ 42, 44.  As in Contrera, "[t]his evidence easily meets plaintiffs' modest burden at the conditional [approval] stage."  278 F. Supp. 3d at 715.  In a case where defendants similarly argued that they did not constitute a joint enterprise, the Court declined to "resolve this dispute on this motion."  Zhenkai Sun v. Sushi Fusion Express, Inc., 2018 WL 2078477, at *1 n.1 (E.D.N.Y. Jan. 2, 2018), adopted by, 2018 WL 1168578 (E.D.N.Y. Mar. 6, 2018).  We take the same position and conclude that a collective action should be approved provided plaintiffs demonstrate that "potential class members are 'similarly situated.'"  Hoffmann, 982 F. Supp. at 261 (quoting 29 U.S.C. § 216(b)).[2]  Thus, we turn next to the scope of the proposed collective action.

    B.  Scope of Collective Action

As we explained in Contrera, there are

> two broad methods by which a plaintiff may show he or she is "similarly situated" to the group of employees to whom he or she seeks to send notice of a lawsuit.  One is a "top-down" method of proof, in which a plaintiff provides evidence from a central office or from management levels of an employer showing that the employer had a policy or practice of treating all employees in the class similarly with respect to the allegedly illegal labor law practice. . . .  The other form of proof may be called "bottom-up" — that is, where plaintiffs and sometimes other employees provide affidavits conveying their own experience with the employer, or recount conversations with other employees, and then seek to draw an inference that an illegal policy or practice exists that covered a group of employees broader than the plaintiff or the other employees who provided the affidavits.

---

[2] Defendants make similar argument that certain entities should be "excluded from certification."  See Def. Mem. at 14-15.  For the reasons stated above, we do not view these arguments as a basis for finding employees are not similarly situated..

11

278 F. Supp. 3d at 716.  Here, plaintiffs provide only "bottom-up" arguments in the form of the affidavits submitted by Perez and Arias, in which plaintiffs recount their own experiences and conversations with other employees.

1. Including Supervisors and "All Non-Exempt Non-Managerial" Employees

Plaintiffs ask that the Court approve a collective of "all current and former non-exempt and non-managerial employees" employed by defendants since December 29, 2016.  Notice of Motion at 2.  Defendants concede that plaintiffs have demonstrated that at least some of their employees are similarly situated to plaintiffs but argue that plaintiffs' proposed collective is too broad; instead, the "prospective collective members should be limited to construction workers, painters, finishers and laborers who worked for Defendant Escobar Construction."  Def. Mem. at 11.  They argue that plaintiffs have failed to demonstrate that "the alleged supervisors were paid below minimum wage or denied overtime payments," id., that plaintiffs' have not established that "all non-managerial employees of Defendants" are similarly situated, id. at 12, and that notice should be limited to plaintiffs employed by Escobar in New York, id.

Defendants cite to a single case in arguing that plaintiffs have failed to demonstrate that supervisors are similarly situated: Jian Wu v. Sushi Nomado of Manhattan, Inc., 2019 WL 3759126, at *10 (S.D.N.Y. July 25, 2019).  In that case, the Court found that receptionists should not be included as a category within the proposed collective, because the plaintiff did not state "that he has any knowledge as to whether these receptionists' hourly rates of pay actually fell below the federal minimum wage, and his vague statements regarding their 'low' wages do not suffice to evidence that their pay rates were unlawful."  Id.  The Court also noted that "as both of the two referenced receptionists purportedly worked part-time, it does not appear that they would have been denied overtime pay."  Id.

12

Here, Perez's affidavit reflects that one supervisor, Guzman, told him in the summer of 2018 that he was paid $1200 a week, with the amount "always stay[ing] the same." Perez Aff. ¶¶ 103-06. Arias's affidavit claims that Guzman told him "in Ithaca, 2018 during lunch time" that he was paid $1200 "per week with no overtime pay." Arias Aff. ¶¶ 127, 126. Arias also claims that the son of David Analla, another supervisor, told him in 2018 that Analla "was paid at a weekly rate of [$2000] . . . with no overtime pay." Id. ¶¶ 133-34.

While the evidence submitted is sparse, it is enough to include supervisors in the proposed collective at this stage. Plaintiffs need only make "a modest but job-specific factual showing" to satisfy their burden, and Arias's affidavit, in which he relates how he knows that the supervisors were not paid overtime, satisfies that modest standard, particularly when one considers Perez's affidavit and the information he relates there concerning Guzman. Yap v. Mooncake Foods, Inc., 146 F. Supp. 3d 552, 565 (S.D.N.Y. 2015). This case thus differs from Jian Wu, where plaintiffs made only "vague statements regarding" the receptionists' "low" wages. 2019 WL 3759126, at *10. Here, the affidavits of Arias and Perez relate conversations with supervisors in which the supervisors stated that they were not paid overtime. Perez Aff. ¶¶ 103-06; Arias Aff. ¶¶ 126-27,132-34. The Court may infer from these affidavits that, like plaintiffs, supervisors employed by defendants were routinely denied overtime, as plaintiffs allege, Am. Compl. ¶ 51, and thus are similarly situated.

However, the Court agrees with the defendants that the proposed collective is otherwise too broad. Plaintiffs seek to send notice to "all non-exempt non-managerial Escobar/Nations Constructions employees," Pl. Mem. at 18, but the complaint and affidavits submitted, like in Jian Wu, "offer no substantive information . . . about any categories of workers other than those discussed above." 2019 WL 3759126, at *10. Plaintiffs assert in their briefing that the

categories listed in their affidavits "cover[] all non-exempt non-managerial . . . employees," Pl. Mem. at 18, but this statement is not supported by anything in the affidavits or complaint. It may be that all of defendants' non-exempt, non-managerial employees fall within the categories of construction worker, painter, laborer, finisher, and supervisor. But plaintiffs have not demonstrated that this is so, and "thus we cannot say that there is evidence that plaintiffs are similarly situated to all 'non-exempt' employees, as plaintiffs would have it." Garcia v. Spectrum of Creations Inc., 102 F. Supp. 3d 541, 550 (S.D.N.Y. 2015). Accordingly, notice will be limited to the categories outlined in plaintiffs' affidavits: construction workers, painters, laborers, finishers, and supervisors.

2. Limiting Notice to New York Employees

Defendants argue that any notice should be sent only to employees of defendants who worked "within the State of New York." Def. Mem. at 12. They argue that the Court could not send notice to employees who worked at job sites outside New York, because doing so would conflict with Supreme Court precedent — in particular Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty., 137 S. Ct. 1773 (2017), which discusses limitations imposed by the Due Process Clause on a court's exercise of personal jurisdiction. Id. at 13. In their responsive brief, plaintiffs not only fail to address the effect of Bristol-Myers, they do not even address the merits of the argument at all. Instead, they simply assert that because plaintiffs have shown that "they and their coworkers suffered [the] same unlawful employment practices across various construction worksites all over the country," that "collective certification should be extended outside the state of New York." Pl. Reply at 5. We thus consider defendants' jurisdictional argument unopposed and grant defendants' motion for this reason alone.

14

Even if we were to consider the argument on the merits, we find the defendants' argument persuasive.  Contrary to plaintiffs' response, the issue raised by defendants is not whether the potential out-of-state plaintiffs are similarly situated to Perez and Arias.  Rather, it is whether the Court could exercise jurisdiction over their claims even if the potential plaintiffs are similarly situated.  As alleged by plaintiffs, none of the defendants in this case are New York residents.  The corporate defendants are incorporated in Indiana with their principal places of business in Indiana.  Am. Compl. ¶¶ 9, 12, 15.[3]  Thus, under Fed. R. Civ. P. 4(k)(1)(A), personal jurisdiction in this case must be premised on whatever jurisdiction would be permitted under New York law.  The New York long-arm statute, however, as is true for all long-arm statutes, is limited by the Fourteenth Amendment's Due Process Clause.  See Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010) ("If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution.").  The Due Process Clause would permit personal jurisdiction over an out-of-state defendant as to any cause of action (that is, general jurisdiction) only if the corporations' "affiliations with the State are so continuous and systematic as to render [them] essentially at home in the forum State."  Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) (punctuation omitted).  That has not been alleged here, so plaintiffs would have to show that there is specific jurisdiction over the claims arising out of state.

In Bristol-Myers, however, the Supreme Court held that "for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State."  137 S. Ct. at 1781 (punctuation omitted).  Bristol-Myers found that specific jurisdiction was lacking in

---

[3] No information is given as to the individual defendants' residences.

that case, a mass torts action brought in California, over claims brought by non-resident plaintiffs that claimed to have been harmed by defendant's activities outside of California.  The Court explained that simply because "other plaintiffs[']" claims derived from activity in California and those plaintiffs "allegedly sustained the same injuries as did the nonresidents — does not allow the State to assert specific jurisdiction over the nonresidents' claims," because "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction . . . even when third parties . . . can bring claims similar to those brought by the nonresidents."  Id. (emphasis in original, punctuation omitted).  The Court emphasized that "[w]hat is needed — and what is missing here — is a connection between the forum and the specific claims at issue."  Id.

Since Bristol-Myers, federal district courts have disagreed on the decision's applicability to FLSA claims.  See Pettenato v. Beacon Health Options, Inc., 425 F. Supp. 3d 264, 275 (S.D.N.Y. 2019) (collecting cases); see also Adam Drake, The FLSA's Bristol-Myers Squibb Problem, 89 Fordham L. Rev. 1511 (2021) (detailing the district court split and thoughtfully analyzing the issue).  Having considered these cases, we are persuaded that, where defendants are not subject to general jurisdiction in the forum state, the Due Process clause does not permit a collective action that includes employees who did not work in the forum state.  See Pettenato, 425 F. Supp. 3d at 278.  We pause to address one particular argument that is sometimes made in this context: that applying Fed. R. Civ. P. 4(k)(1)(A) to bar plaintiffs with out-of-state FLSA claims against non-resident defendants would "greatly diminish the efficacy of FLSA collective actions as a means to vindicate employees' rights."  Swamy v. Title Source, Inc., 2017 WL 5196780, at *2 (N.D. Cal. Nov. 10, 2017).  In fact, the application of Bristol-Myers to FLSA claim would have no such effect since a nationwide collective could be approved in the

employer's home state. See, e.g., Greinstein v. Fieldcore Servs. Sols., LLC, 2020 WL 6821005, at *6 (N.D. Tex. Nov. 20, 2020) ("[N]othing about a territorial limit prevents a nationwide collective action. The plaintiff merely must sue where the defendant is subject to general jurisdiction.").

Because this Court cannot exercise general jurisdiction over defendants, it will require that notice be sent only to plaintiffs who have claims it could exercise specific jurisdiction over. Accordingly, we will limit the proposed collective to employees falling into the previously-mentioned job categories who worked at one of defendants' sites in New York. It appears those work sites consist of sites at Ithaca and Binghamton. See Perez Aff. ¶ 23.

Defendants cursorily argue that some individual defendants should be dismissed from the litigation. See id. at 15-16. But such an application is irrelevant to a motion for conditional approval of a FLSA collective and thus an opposition brief to a motion for conditional approval is not the appropriate vehicle for advancing such arguments. See generally Local Civil Rule 7.1(a) (requiring a notice of motion for any motion for relief). If defendants seek to dismiss any defendants, they should make an appropriate motion (after first seeking permission in accordance with the Court's Individual Practices).[4]

Accordingly, notice is authorized as to all construction workers, painters, laborers, finishers, and supervisors employed by defendants who worked at the Binghamton or Ithaca work sites.

---

[4] For the same reasons, we decline to address defendants' "miscellaneous" request that plaintiffs "provide updated lists of opt-in plaintiffs with relevant pertinent information to Defendants' counsel by email on a biweekly basis." Def. Mem. at 29. The parties should discuss this request and, if agreement cannot be reached, raise it with the Court in accordance with the Court's Individual Practices.

### C. Equitable Tolling

Finally, plaintiffs ask that this Court equitably toll the statute of limitations "for 90 days until the expiration of the Opt-In Period." Pl. Mem. at 31. Defendants oppose this request. Def. Mem. at 27. Plaintiffs also ask that the notice period be calculated "from the complaint filing date," rather than from three years prior to the date the notices are actually mailed. Pl. Mem. at 26.

Plaintiffs acknowledge that "to grant equitable tolling, the court does not look into the diligence of a plaintiff who filed a claim, but instead the court looks into the diligence of a potential plaintiff who is seeking to file the claim." Pl. Mem. at 31 (citing McGlone v. Contract Callers, Inc., 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012)). Plaintiffs then assert that "the opt-in plaintiffs for whom tolling is sought acted diligently in pursuing their rights," but give no details as to how they have done so. Id. In their reply, plaintiffs assert that equitable tolling is justified "because the potential opt-in Plaintiffs or collective members [were] never given the opportunity to learn their rights." Pl. Reply at 9.

This Court previously rejected similar bareboned arguments for equitable tolling in Contrera v. Langer, 278 F. Supp. 3d 702, 723-24 (S.D.N.Y 2017). As the Supreme Court has stated, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). As in Contrera, plaintiffs here have failed to establish the first prong because they "provide no facts or even arguments regarding existing or potential opt-in plaintiffs that reflect that these employees of the defendants have been pursuing their rights diligently." 278 F. Supp. 3d at 723. Thus, "we have no basis for making a ruling at this time that any current or future opt-in employees' claims must be equitably

tolled given that there has been no showing that they have met the 'diligence' prong of the equitable tolling doctrine." Id. at 725.  Accordingly, plaintiffs' request for equitable tolling is denied.  Should plaintiffs who join the collective action have time-barred claims, they may present arguments for equitable tolling at that point.[5]

IV.  CONCLUSION

For the foregoing reasons, plaintiffs' motion (Docket # 67) is granted in part and denied in part.

SO ORDERED.

Dated: May 20, 2021
       New York, NY

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[5] As for plaintiffs' request that the "opt-in anchor date" be measured as three years "from the complaint filing date," Pl. Mem. at 26, we gave reasons in Contrera, 278 F. Supp. 3d at 726-28, why we would not grant such a request by the plaintiffs in that case.  Here, however, defendants have not challenged the date proposed by plaintiffs, see Def. Mem., Exh. 4, at 1, and thus we will grant plaintiffs' request as unopposed.

19